[No. 936.]

## HENRY FISHBACK, RESPONDENT, *v.* JEREMIAH MILLER, APPELLANT.

SALE OF MINE—FRAUDULENT REPRESENTATIONS—CAVEAT EMPTOR.—The rule of *caveat emptor* applies only when buyer and seller have equal opportunities of knowledge, and when the defect complained of is patent and obvious to the senses. It does not apply to a case where the seller of a mine makes representations in respect to matters of which the buyer has no knowledge, and no means at hand of obtaining knowledge.

IDEM—SOLE INDUCEMENT TO PURCHASE.—It is not necessary that the fraudulent representation should have been the sole and exclusive inducement to the purchase. It is enough that it may have constituted a material inducement.

IDEM—BURDEN OF PROOF THAT REPRESENTATIONS WERE NOT RELIED UPON.— When representations made by the seller are shown to be material and false, the burden is upon him to show that they were not relied upon by the buyer, and that the purchase would have been made without the representations.

APPEAL from the District Court of the Sixth Judicial District, White Pine County.

The facts are stated in the opinion.

*A. M. Hillhouse, and Greathouse & Blanding,* for Appellant:

I. The fifth instruction given to the jury is not only too broad, and therefore misleading, but is entirely erroneous in point of law. Where the representations were express, and in writing, the purchaser has a right to rely upon them, and is not bound to "test their truth or falsehood," by any "vigilance or attention." (*Mead* v . *Bunn,* 32 N. Y. 275; *Risch* v. *Von Lillienthal,* 34 Wis. 250.)

*Caveat emptor* does not apply to the solemn assurances of

the vendor, and a man has a right to rely on the truthful-
ness of the representations of those with whom he deals.
(Kerr on Fraud and Mistake, 79; Bigelow on Fraud, 67;
*Mead* v. *Bunn*, 32 N. Y. 275, 280; *McClellan* v. *Scott*, 24
Wis. 81, 87; *Upshaw* v. *Debow*, 7 Bush, 442; *Walsh* v. *Hall*,
66 N. C. 233; *Hale* v. *Philbrick*, 42 Iowa, 81; *Oswald* v. *Mc-
Gehee*, 28 Miss. 340; *Spalding* v. *Hedges*, 2 Pa. St. 240; *Stark-
weather* v. *Benjamin*, 32 Mich. 305; *Matlock* v. *Todd*, 19 Ind.
130; *Parham* v. *Randolph*, 4 How. (Miss.) 435; *Kiefer* v.
*Rogers*, 19 Minn. 32; *Young* v. *Hopkins*, 6 Mon. 23; *Camp-
bell* v. *Whittingham*, 5 J. J. Marsh. 96; *Bailey* v. *Smock*,
61 Mo. 213; *Holland* v. *Anderson*, 38 Id. 55; *Claggett* v.
*Crall*, 12 Kans. 393; *David* v. *Park*, 103 Mass. 501; *Brown*
v. *Castles*, 11 Cush. 348; *Manning* v. *Albee*, 11 Allen, 520;
S. C., 14 Id. 7; *Watson* v. *Atwood*, 25 Conn. 313.)

II. The maxim *caveat emptor* does not apply when the
vendor of property resorts to any artifice to put the pur-
chaser off his guard.      (*Swimm* v. *Bush*, 23 Mich. 99;
*Webster* v. *Bailey*, 31 Id. 36; *Baker* v. *Seahorn*, 1 Swan, 54;
*Gant* v. *Shelton*, 3 B. Mon. 423; *Phelps* v. *Quinn*, 1 Bush,
375; *Robertson* v. *Clarkson*, 9 B. Mon. 507; *Biggs* v. *Perkins*,
75 N. C. 397.)

III. The fifth instruction is further erroneous, in this, that
it nowhere contains any definition of " ordinary vigilance
and attention."

IV. In the sixth and seventh instructions, the jury are
told that the misrepresentations, in order to be of any avail
as a defense, must have constituted " the sole inducement,"
and must have been " relied upon exclusively as the in-
ducement to the purchase;" and, in the sixth instruction,
they are further told, that " the burden of proof is on the
defendant to establish, by a preponderance of evidence,
that he relied upon the false representations as the sole
inducement."     Both of these propositions are clearly er-
roneous. (Kerr on the Law of Fraud and Mistake, 74;
*Shaw* v. *Stine*, 8 Bosw. 157; *Addington* v. *Allen*, 11 Wend.
381; Bigelow on Fraud, 88; *Cabot* v. *Christie*, 42 Vt. 121;
*James* v. *Hodsden*, 47 Id. 137; *Young* v. *Hall*, 4 Ga. 95.)

V. The sixth instruction, given at request of plaintiff, is

erroneous as a rule of evidence. It tells the jury, that the burden of proof is on defendant to establish, by a preponderance of evidence, that the false representations made by Powell were relied upon by defendant as the sole in-inducement to the purchase. This is error. (Kerr on the Law of Fraud and Mistake, 75.)

VI. The first instruction, given at the request of plaintiff, is erroneous; first, because it is not true, as an abstract proposition of law; and, secondly, because, even if true, as an abstract proposition, it was inapplicable to the case at bar in this, that there was no evidence tending to show equality of opportunity for " observation and judgment." (*Winter* v. *Bandel*, 30 Ark. 362; *State* v. *Squaires*, 2 Nev. 233.)

This instruction is also intrinsically erroneous and misleading, under the authorities cited, and for the reasons given, in points I and II.

VII. Plaintiff can not contend that, while his instructions are contradictory, the law is correctly stated in those of the defendant, and that, therefore, the contradictions in plaintiff's instructions are cured. (3 Gra. & Wat. on N. T. 800; *Winchell* v. *Latham*, 6 Cow. 682; *Wilder* v. *Cowles*, 100 Mass. 487; *Van Slyck* v. *Mills*, 34 Iowa, 375; *Davis* v. *Strohm*, 17 Id. 421.)

VIII. The fact that defendant visited the ground personally would not of itself, in any way, have tended to prove that he did not rely entirely upon the representations of Powell, even had Powell then remained silent and had not forestalled further examination by a rewarranty. (*Risch* v. *Lillienthal*, 34 Wis. 255.)

IX. Even where the representations have simply been as to title, and the vendee has his adequate remedy at law on the covenants of his deed, yet a court of equity will rescind the contract. (*Upshaw* v. *Debow*, 7 Bush (Ky.), 446.)

X. The total absence of all consideration was of itself alone conclusive of the fraud, and entitled the defendant to a rescission. (*Risch* v. *Von Lillienthal*, 34 Wis. 258; Kerr on Fraud and Mistake, 186, 187; *Kuelkamp* v. *Hidding*, 31 Wis. 503.)

*Thomas Wren, Crittenden Thornton, and Thomas Laspeyre,* for Respondent:

I.  The rule for which appellant's counsel contend, in their first point, is too broadly stated.  It would convert every representation into a warranty.

The averments of the false representations of Powell, his knowledge of their falsehood, the reliance of defendant thereon, the defendant's lack of means or opportunity of knowledge, and the offer to reconvey the property, are entirely foreign to any action or defense based upon a breach of warranty.  The defendant is bound by the scope and theory of his own pleading.  In an action on the case, or in assumpsit for breach of warranty, the allegation of a *scienter* is immaterial.  If made, it need not be proved. (*Schuchardt* v. *Allens,* 1 Wall. 368; *Williamson* v. *Allison,* 2 East, 446; *Gresham* v. *Postan,* 2 Carr. & P. 540; *Brown* v. *Edgington,* 2 Man. & Gran. 279; *Holman* v. *Dord,* 12 Barb. 336; *House* v. *Fort,* 4 Blackf. 293; *Trice* v. *Cockran,* 8 Gratt. 449; *Lassiter* v. *Ward,* 11 Ired. L. 443.)

So, in an action for a breach of warranty, the vendee can not disaffirm the sale and return the property.  His remedy is an action for damages for breach of contract. (*Voorhees* v. *Earl,* 2 Hill, 288; *Cary* v. *Gruman,* 4 Id. 625; *Thornton* v. *Wynn,* 12 Wheat. 193; *Mondell* v. *Steel,* 8 Mees. & Wels. 858; *Street* v. *Blay,* 2 B. & Ad. 456; *Gompertz* v. *Denton,* 1 Cr. & M. 207; *Pateshall* v. *Tranter,* 3 Adol. & El. 103.)

The distinction between " representations " and " warranties " is too firmly fixed to be obliterated at this day. It is important to be understood and maintained in this case.  The fact that a representation is in writing does not convert it into a warranty.  Neither is a warranty any the less a warranty because not in writing.  Writing or no writing is a false quantity in the definition.

The true distinction seems to be between a mere assertion or representation, however positive, extrinsic to the contract, although relating to its subject-matter and influencing the judgment of the purchaser, and a promise or undertaking entering into the contract and forming one of

its terms. (*Borrekins* v. *Bevan*, 3 Rawle, 45; *McFarlan* v. *Newman*, 9 Watts, 56; *Hopkins* v. *Tanqueray*, 15 Com. B. 130; *Duffie* v. *Mason*, 8 Cow. 25; *Cooke* v. *Mosely*, 13 Wend. 277; *Kinley* v. *Fitzpatrick*, 4 How. (Miss.) 59; *House* v. *Fort*, 4 Black. 293.)

The quotation from the text of Bigelow on Fraud, 67, 68, is not sustained by the cases cited in appellant's brief, many of which were cases of representations as to the title of real property. They are in opposition to the entire line of modern decisions, and destructive of the spirit and intent of recording acts in general. The question of title is not involved in this case. If it were, we should have no fear in opposing to the cases cited by the text-writer the authority of *Peabody* v. *Phelps*, 9 Cal. 213, and *Hastings* v. *O'Donnell*, 40 Id. 148.

The cases cited by appellant (which are reviewed), lack the force of authority in support of the general proposition which they announce.

Many of the cases turned upon special circumstances of each, and not upon the general rule as laid down by the text-writer and quoted by counsel. They are founded upon circumstances, which show a peculiar relation of confidence, or the lack of equal means of information, such as residence at a distance from the locality of the property, or means and artifices successfully used to dissuade from investigation, where inquiry would have afforded knowledge and protection.

II. The first instruction was not calculated to mislead the jury. The vice of the argument of the counsel, and the error of the text-writer, consist in the statement of the exception instead of the rule. The rule, as stated by Chancellor Kent (2 Com. 485, 486), and sustained by the authorities, is the same as the language of the plaintiff's first instruction. Reasonably construed, the rule does not import that all human knowledge, or all expedients, or devices, to guard against fraud, must be invoked. Exceptions are reasonably implied. The distance of the subject-matter of the bargain, any existing relation of special trust, or confidence, beyond the simple attitude of buyer and seller, or any fraudulent

device to prevent inquiry, or to render it unavailing, would constitute such exceptions. No such facts appear in this case.

III. The criticism of counsel for appellant, upon the sixth and seventh instructions to the jury, given at the request of respondent, is labored and ingenious. The argument is based upon the assumption, that the words sole and exclusively refer to the collective weight or influence of all the inducements operating upon the mind of Miller.

There were but two actors in this comedy, Miller and Powell. One asserted, and the other believed. One knew, or pretended to know, and the other was ignorant. No inducements would have existed if Powell had not spoken. Miller knew of none. What error or injury could arise from telling the jury that the defendant must have relied upon Powell alone, and upon his representations solely and exclusively?

By a comparison of the instructions, it will be seen that the words sole and exclusively relate to the personal origin of the representations and inducements under the influence of which the appellant acted. The instructions are equivalect to a direction that the false representations which will constitute a defense must be those of Powell. If any inducements existed, they were the offspring of Powell's assertions. The representations bear to the inducements the relation of cause to effect. For any results not the consequence of those causes the plaintiff is not responsible.

The instructions in this case are not liable to the objection that they, or either of them, have selected a single circumstance, or fact or assertion, and placed that before the jury as the sole cause of the plaintiff's confidence. There were not several sources of fraudulent statements, or several representations, some immaterial, some trivial in importance, some persuasive, some almost convincing. There were not several persons, some innocent, some guilty, some strangers without influence, some friends with influence, whose united assertions may have turned the scale.

IV. In reply to the first branch, appellant's sixth point, we are content to cite 2 Kent's Com. 485, 486. The instruction is substantially in the language of the text.

The cases cited by counsel for appellant on this point, turned upon the fact, as it appeared before the court, that there did not appear to be an equal opportunity of observation and judgment. The evidence in the case at bar showed that Miller's opportunity and ability to inspect was ample. More than this; it was exercised. The following authorities show the consequence of equal opportunities, when afforded, acted upon, and improved. (*Dyer* v. *Hargrave*, 10 Vesey, Jr. 506; *Jennings* v. *Broughton*, 17 Beav. 234; S. C., 5 De Gex. M. & G. 125; *Attwood* v. *Small*, 6 Cl. & Fin.; *Lysney* v. *Selby*, 2 Ld. Raym. 1118; *Slaughter's Adm'r* v. *Gerson*, 13 Wall. 383.)

V. There is no conflict between the first and fifth instructions of plaintiff, on the one hand, and the sixth and seventh, on the other. They relate to distinct and different propositions. In any action or defense founded on fraudulent representations, the issues are four: First, were the representations material? second, were they false? third, did the party defrauded rely upon them? fourth, did he use any diligence or prudence in his own behalf? No necessary contradiction is involved in the giving of one instruction, which relates to a single issue, conclusive in itself, and a second instruction, which has reference to another issue, equally conclusive. Every limitation of the general proposition on which a case rests, need not be expressed in a single instruction.

*Greathouse & Blanding*, for Appellant, in reply:

Counsel filed a brief, reviewing at great length the positions taken by respondent.

I. There is no necessity for the discussion indulged in as to the difference between warranty and representation. There is no question of warranty in this case. It is a simple matter of the effect of false representations. *Peabody* v. *Phelps*, 9 Cal. 213, and *Hastings* v. *O'Donnell*, 40 Id. 148, with respect to title, are not law.

It is well settled that false representations as to title will support any appropriate form of action or defense. (*Alvarez* v. *Brannan*, 7 Cal. 503; *Wright* v. *Carillo*, 22 Id. 604, 606;

*Parham* v. *Randolph,* 4 How. Miss. 435; *Watson* v. *Atwood,* 25 Conn. 313; *Walsh* v. *Hall,* 66 N. C. 233; *McClellan* v. *Scott,* 24 Wis. 81; *Claggett* v. *Crall,* 12 Kans. 393; *David* v. *Park,* 103 Mass. 501; *Culver* v. *Avery,* 7 Wend. 380.)

II. Recording acts only affect a limited class with constructive notice, and this only in certain cases. They have no effect upon and impart no notice as between immediate parties dealing with each other. They are intended merely for the protection of subsequent purchasers and incumbrancers. (*Sharon* v. *Minnock,* 6 Nev. 378; *McCabe* v. *Grey,* 20 Cal. 509; *Chamberlain* v. *Bell,* 7 Id. 294.)

III. The case of express and specific misrepresentations is not an exception to the rule of *caveat emptor.* It is really another and a different rule altogether. It is the rule of good faith and common honesty which, when a seller has once expressly asserted a fact, does not permit him to turn round and say, "you had no right to rely upon my assertion, but should have suspected its falsehood."

By the Court, BEATTY, C. J.:

This is an action on a promissory note. The defense is fraud and failure of consideration. The following is the substance of the answer: It is alleged that prior to March 3, 1869, plaintiff and others were owners of a pretended quartz lode, situated in White Pine county, in this state; that, being desirous of selling the same, they conveyed their respective interests to J. C. Powell, who afterwards, at the city of San Francisco, opened negotiations with defendant for the sale to him of said mine; that said Powell, on the third of March, 1869, and at divers times prior thereto, represented to the defendant that said mine was intrinsically very valuable; that a shaft was sunk on the lode to the depth of ten feet, and that the ore of said vein, at the bottom of the shaft, would assay one thousand dollars per ton; that defendant had no opportunity at that time to inspect or examine the mine, or to make test of the value of the ores therein; that he relied wholly on Powell's representations as to the depth of the shaft, and the value of the ores therein, and, so relying, concluded a bargain by which

he agreed to pay two thousand dollars down, and give his note for four thousand dollars more; that on the third of March, 1869, Powell executed a conveyance of the mine, and defendant paid him two thousand dollars in cash, and executed the note referred to in the complaint, by which he promised to pay the plaintiff, thirty days after date, the sum of four thousand dollars in gold coin; that he afterwards paid two thousand dollars on said note; that before the payment of the remaining two thousand dollars he discovered that the representations of Powell, concerning the mine, were utterly false and fraudulent; that no shaft had been sunk on said mine, but only a little hole two and a half feet deep, in which no ore could be found that would assay more than fifty dollars per ton; that Powell's representations were false and fraudulent, and made with the express purpose of cheating and defrauding the defendant; that defendant, immediately upon the discovery of the fraud, repudiated the purchase, tendered a reconveyance of the mine, and demanded back the money he had paid; wherefore, he denies any indebtedness to plaintiff, and asks a judgment for his costs.

The cause was tried in the district court before a jury, who found a verdict for plaintiff for two thousand dollars and interest from April 3, 1869. Defendant moved for a new trial, which was refused, and he now appeals from that order and from the judgment.

The errors relied on in support of the appeal relate exclusively to the instructions of the court given to the jury at the request of the plaintiff. Before entering upon a discussion of these instructions, however, it will be necessary to state the substance of the testimony adduced at the trial.

It appears that for more than six months prior to March, 1869, Miller and Powell were both residents of the White Pine mining district, in which the Hopkins mine (the mine referred to in the pleadings) was located. A large number of mineral discoveries had been made in the district, which were then supposed to be extremely valuable. Among others, the California mine had a great reputation. The

Hopkins lode was located a short distance from the California mine, and this fact Miller knew. He had, however, never been upon the location, and only knew in a general way that it was near the California. The winter of 1868–69 and the following spring were a period of great excitement regarding the White Pine mines; numerous locations were made, and anything that showed a prospect of value was salable, especially if it was in the vicinity of a mine like the California.

Miller was a speculator in mines, engaged in buying up such locations as he thought he could sell at a profit; he had been engaged in that business for several years, and was as good a judge of the value of a mine as Powell.

Prior to January, 1869, Powell had agreed to sell the Hopkins mine to one Tolles, for six thousand dollars, provided the money was paid within a certain time. The time for payment was about to expire, and, Tolles not being able to make the payment, Miller offered, without ever having seen the mine, and without any knowledge of it, except what he had derived from Tolles, to become responsible for the payment of the six thousand dollars, if Powell would execute a conveyance of the mine, and put the deed in his hands. His object in making this offer, was to obtain a share of the profit which Tolles expected to realize upon a resale of the property to parties with whom he was then (January, 1869) in negotiation.

Miller's offer, in behalf of Tolles, seems to have been declined; at all events, nothing came of it; and after the time for Tolles to make payment had expired, Miller offered, in his own behalf, to give Powell five thousand dollars for the claim—one thousand dollars down, and four thousand dollars in sixty days. Powell concluded to accept this offer, but, in the mean time, Miller had received an unfavorable report of the mine from one Ingoldsby, with whom he had been connected in some mining transactions, and when Powell offered to make a conveyance, he retracted his offer of five thousand dollars. Miller then went to San Francisco, and Powell, also, a few days later. In San Francisco Miller sought Powell, and renewed negotiations for the

purchase of the Hopkins mine. In the course of these negotiations, Powell made statements which were substantially embodied in a writing, which he drew up and signed and delivered to Miller before the completion of the purchase. The following is the material portion of that writing:

"The Hopkins ledge and company contains one thousand feet, located December 4, 1868, situate on the southern slope of Treasure Hill, about one thousand two hundred feet south-east from the California mine, on the same ridge. It crops out about three hundred feet, showing ore the entire distance. I have had four assays, ranging from one hundred dollars to one thousand seven hundred and sixty-one dollars and twenty-five cents. * * * There is work done on it nearly every place. Shaft down on the center of the claim about ten feet deep, showing an improvement in the character of the quartz as depth is attained. The one thousand seven hundred and sixty-one dollars and twenty-five cents assay was from work at the bottom of the shaft.

Upon the receipt of this statement, and a deed conveying the mine, Miller paid Powell two thousand dollars, and executed and delivered the note upon which this action is founded. A few days later Miller and Powell returned to White Pine, and Miller requested Powell to point out the Hopkins mine to him. They went together to the ground and found only a little hole two or three feet deep on the croppings of the lode. Powell, however, said that that was not the shaft referred to in his statement; that the shaft must be filled up with snow, and, as he was not very familiar with the premises, he would send up another man to point out the shaft. The ground was at that time covered in most places with snow, and Miller, accepting Powell's explanation, and upon his urgent request, paid two thousand dollars on the note. A few days later Powell sent a man with Miller to point out the shaft; but this man took him to the same little hole that had been shown him by Powell, and which was in truth the only pretense of a shaft that had ever been sunk on the claim. Miller thereupon repudiated the purchase, tendered a sufficient deed of reconveyance, and demanded back the money he had paid.

Miller testified that he made the purchase wholly re-lying on the statements of Powell, and it was conclusively proved that the mine was of no intrinsic value; that no shaft had been sunk on it other than the little hole above mentioned, and that no ore could be found in or about that hole yielding an assay greater than two dollars and sixty cents per ton.   Powell, who was the only witness examined on the part of the plaintiff, admitted that he had never had or made any assays from the mine, but had based his state-ments to Miller upon statements made to him by Tolles as to the assays, and by Fishback (the plaintiff) as to the work on the vein.   There was other testimony, but nothing of consequence.

Such being the case, the court gave to the jury, at the re-quest of the plaintiff, the following instructions:

"1.  While the law affords to every one reasonable protec-tion against fraud in dealing, it does not protect against the consequences of indolence and folly, or a careless indiffer-ence to the ordinary and accessible means of information. The law requires the purchaser to apply his attention to those particulars which may be supposed to be within the reach of his own observation and judgment.

"If the purchaser be wanting in attention to those points where attention would have been sufficient to protect him from surprise and imposition, the maxim that the buyer must be on his guard applies.

"4.  Even if Miller was actually deceived and defrauded, then if he reaffirmed the contract afterwards, with knowl-edge or fair means of knowledge or notice of the fraud, you should find for the plaintiff, and the payment of two thousand dollars is a reaffirmance if made with knowledge of all the facts.

"5.  If the truth or falsehood of the representations might have been tested by ordinary vigilance and attention, it was Miller's own folly if he neglected to do so, and in such case you must find for plaintiff.

"6.  The burden of proof in regard to every material al-legation of the defense is upon the defendant.   Therefore, the  defendant must establish by a preponderance of evi-

dence that the representations made by Powell were false, and the defendant relied upon such representations as the sole inducement to the purchase of the Hopkins location.

" 7. The execution and delivery of the note in suit is admitted by the defendant, and the only questions for the jury to find are, whether the representations of Powell were false, and whether the defendant, Miller, relied upon the same exclusively as the inducement to the purchase of the property."

These instructions were erroneous and prejudicial to the defendant in more than one particular. By the first and fifth the maxim of *caveat emptor* is applied to a case in which it is wholly inapplicable. That rule applies when buyer and seller have equal opportunities of knowledge, and when the defect complained of is patent and obvious to the senses; but it does not apply to a case like this, where the seller makes express representations in respect to matters of which the buyer has no knowledge and no means at hand of obtaining knowledge.

In Bigelow on Fraud (67 *et seq.*) this question is largely discussed, and the authorities cited in the notes fully sustain that passage of the text in which the author says: "Every contracting party, not in actual fault, has a right, however, to rely upon the express statement upon existing fact, the truth of which is known to the contracting party who made it, and unknown to the party to whom it is made, when such statement is the basis of a mutual engagement. He is under no obligation to investigate and verify the statement, to the truth of which the other party to the contract, with full means of knowledge, has deliberately pledged his faith." (p. 67.)

If, then, Miller was without actual fault, he was under no obligation to investigate and verify Powell's statements, and it would have required something more than ordinary vigilance and attention to do so. The sale was negotiated in San Francisco; the mine was more than five hundred miles distant. It is true that Miller had, for some months previous, resided in the mining district where the Hopkins claim was located; but his residence

in the district imposed no obligation upon him to ex-
amine all the mining locations within its boundaries,
and it was no fault of his that he departed to San Fran-
cisco in complete ignorance of the state of development
of the Hopkins lode, and of the assay value of its ores.

The proof is clear and uncontradicted, that when Miller
went to San Francisco he had never seen the mine, and
knew nothing about it, except what he had heard from
Tolles and Ingoldsby. He had been willing, in January,
for the sake of sharing in the profits of a speculation
which Tolles had in view, to assist him in purchasing
the mine; but this only proves that he was willing to
rely on the judgment of Tolles in a matter where they
were to be jointly interested; it does not prove that he
had any personal knowledge with respect to the property.
Subsequently, he offered five thousand dollars for the mine
on his own account, but his offer was immediately retracted
on hearing Ingoldsby's report. What Ingoldsby's report was
does not appear, but, presumably, it was a report of the act-
ual condition of the claim—a report of a little hole on the
croppings exposing no ore of any value. Upon this report
he decided that the claim was not worth five thousand dol-
lars, and here negotiations concerning the purchase
stopped. When, a month or two later, he met Powell in
San Francisco, time enough had elapsed since the date of
Ingoldsby's inspection for the sinking of a shaft ten feet
deep; and Powell's statement that such a shaft had been
sunk, as well as his statement regarding the assays, was
one which Miller had as much right to rely on as any other
man in San Francisco. To him, as to every one else, the
distance of the mine from the place where the negotia-
tion was pending, was a sufficient excuse for not attempt-
ing to investigate or verify the facts stated by the ven-
dor. It was an error, therefore, to lay down for the guid-
ance of the jury a rule which, under the facts, conclusively
established by all the testimony in the case, could have no
possible operation.

For the same reason, the fourth instruction was errone-
ous. There was no evidence tending to show that at the

time Miller paid two thousand dollars on this note he had any knowledge, or means of knowledge, that Powell's statements as to the shaft and the assays were untrue. He had been to the locality of the mine with Powell, for the purpose of inspecting it; but there was a great deal of snow on the ground, and though the shaft could not be discovered, Powell assured him it was there, and accounted for his inability to point it out by alleging his want of familiarity with the premises, and suggesting that it was filled up with snow. There is no contradiction in the evidence as to these facts, and they show conclusively that the two thousand dollars was paid on this note, while Miller was still in ignorance of the condition of the property, and without means of knowledge, while, in other words, he was still relying on Powell's statements, and still excusable in doing so.

The sixth and seventh instructions contain a proposition that was erroneous. As we understand them, they tell the jury to find for the plaintiff, unless they are satisfied that Powell's representations were the sole and exclusive inducement to the purchase by Miller. But this is not the law. In Kerr on Fraud and Mistake (Bump's American ed. 74) it is said: "It is not, however, necessary that the representation should have been the sole cause of the transaction. It is enough that it may have constituted a material inducement. If any one of several statements, all more or less capable of leading the party to whom they are addressed to adopt a particular line of conduct, be untrue, the whole transaction is considered as having been fraudulently obtained; for it is impossible to say that the untrue statement may not have been precisely that which turned the scale in the mind of the party to whom it was addressed." (See also Bigelow on Fraud, 88, 89, and cases cited.)

Counsel for respondent does not deny that these instructions, taking them in the sense in which we understand them, are technically erroneous; but he contends that the error could not have prejudiced the defendant in this case, because both by his answer and testimony he shows that he was influenced in making the purchase by nothing except Powell's statements. This, however, is by no means clear. He did indeed say in his direct testimony that he

relied wholly on Powell's statement in making the purchase, but he admitted upon cross-examination some previous knowledge concerning the mine, derived from Tolles and Ingoldsby, and the jury may well have concluded that he knew, before seeing Powell in San Francisco, that the Hopkins mine was located near the California, which fact he expressly stated was one inducement to make the purchase. And this statement was perfectly consistent with his answer, in which it is alleged that defendant "relied wholly on the representations of the said Powell *with regard to the depth of the shaft and the value of the ores.*" With respect to these matters only he relied wholly upon the statements of Powell, but he does not allege, and he did not testify, that there was nothing else to induce him to make the purchase. Under the circumstances, we can not say that the error in these instructions was harmless.

The sixth instruction was also erroneous in stating that the burden was on the defendant to establish, by a preponderance of evidence, that the false representations of Powell were relied on by defendant in making the purchase. The rule of evidence is that when representations made by the seller in a case like this are shown to be material and false, the burden is upon him to show that they were not relied on by the buyer, and that the purchase would have been made without the representations. (Kerr on Fraud and Mistake, 75.)

For these errors the judgment and order appealed from must be reversed. Before taking leave of the case, however, we wish to say, in justice to J. C. Powell, that he appears from the testimony to have been himself deceived in regard to the condition of the mine, at the time of his statements to Miller. He was relying on representations made to him by his principal, the plaintiff in this action, and by Tolles. This fact acquits him of any intentional wrong. But having made positive statements which were in fact unfounded, the legal effect is the same as if they had been willfully false, and it is in that sense only that we have spoken of them as false statements.

The judgment and order of the district court refusing a new trial are reversed, and the cause remanded.